Andrew S. Friedman (005425)
William F. King (023941)
**BONNETT FAIRBOURN FRIEDMAN**
**& BALINT, P.C.**
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
afriedman@bffb.com
bking@bffb.com

Paul L. Stoller (016773)
**DALIMONTE RUEB STOLLER, LLP**
2425 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Telephone: (602) 888-2807
paul@drlawllp.com

*Co-Lead Counsel*

[Additional counsel appear on signature page]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| In re Banner Health Data Breach Litigation | Case No. 2:16-cv-02696-PHX-SRB |
|---|---|
| | Hearing Date: April 21, 2020<br>Hearing Time: 10:00 a.m.<br>Courtroom: 502, 5th Floor<br>Judge: Hon. Susan R. Bolton |

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF**

**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**[REDACTED]**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    BACKGROUND ................................................................................... 2

    A.    Summary of the Allegations ...................................................... 2

    B.    Procedural History .................................................................... 3

    C.    Settlement Negotiations ............................................................ 5

III.   THE SETTLEMENT ........................................................................... 7

    A.    The Settlement Class ................................................................. 7

    B.    Description of the Settlement Benefits ...................................... 7

        1.    State-of-the-Art Credit and Identity Monitoring.................. 7

        2.    Monetary Reimbursement for Losses ................................. 8

        3.    Injunctive Relief & Business Practice Commitments........................ 9

            a.    Information Security Practice Changes ............................... 10

            b.    Information Security Spend ................................................. 10

        4.    Additional Terms .............................................................. 11

    C.    The Class Notice, Opting Out, Claim Deadlines, And Release Provisions ................................................................................ 11

IV.   ARGUMENT ...................................................................................... 13

    A.    The Proposed Settlement Warrants the Court's Final Approval.................. 13

        1.    The Settlement Is Presumptively Fair .............................. 14

        2.    The Relative Strengths of Plaintiffs' Claims ................... 15

        3.    The Risk, Expense, Complexity, and Further Litigation ................. 16

        4.    Risk of Maintaining Class Action Status throughout Trial.............. 18

i

5.    The Benefits Offered under the Settlement Agreement .................. 18

6.    Extent of Discovery and Stage of the Proceedings ......................... 21

7.    The Experience and Views of Counsel ............................................ 23

8.    The Presence of a Governmental Participant .................................. 24

9.    The Reaction of the Class Members to the Proposed
       Settlement ........................................................................................ 24

B.    The Court Should Finally Certify the Settlement Class ............................. 24

1.    The Settlement Class Satisfies Rule 23(a) ...................................... 24

2.    The Settlement Class Satisfies Rule 23(b)(3) ................................. 26

V.    THE NOTICE PLAN COMPLIES WITH DUE PROCESS ................................. 28

VI.   CONCLUSION .......................................................................................... 28

1

# TABLE OF AUTHORITIES

2 **CASES** **PAGE**

3

4 *Adams v. Inter-Con Sec. Sys., Inc.*,
No. C-06-5428 MHP, 2007 WL 3225466 (N.D. Cal. Oct. 30, 2007) ................... 15

5

6 *Adkins v. Facebook, Inc.*,
No. C 18-05982-WHA, 2019 WL 7212315 (N.D. Cal. Nov. 26, 2019) ............... 16

7 *Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................ 26

8

9 *Anderson v. Nextel Retail Stores, LLC*,
Nos. CV 07–4480–SVW (FFMx,
10 2010 WL 8591002 (C.D. Cal. Apr. 12, 2010) ........................................ 14

11

12 *Bobbit v. Milberg LLP*,
801 F.3d 1066 (9th Cir. 2015) ........................................................... 27

13

14 *Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ........................................................... 13

15

16 *Ellis v. Naval Air Rework Facility*,
87 F.R.D. 15 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981) ..................... 14

17

18 *Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...................................................... 14, 27

19 *Hammond v. The Bank of N.Y. Mellon Corp.*,
No. 08 Civ. 6060(RMB)(RLE),
20 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ...................................... 16

21

22 *Harris v. Vector Mktg. Corp.*,
No. C-08-5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ................. 22

23

24 *In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ................................................. *passim*

25

26 *In re Anthem, Inc. Data Breach Litig.*,
No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ............. 16

27

28

*In re Apollo Grp. Inc. Sec. Litig.,*
    Nos. CV 04–2147, CV 04–2204, and CV 04–2334–PHX–JAT,
    2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ........................................................ 23

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.,*
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ................................................................... 21

*In re Celera Corp. Sec. Litig.,*
    No. 5:10-cv-02604-EJD, 2015 WL 7351449 (N.D. Cal. Nov. 20, 2015) ............. 17

*In re China Intelligent Lighting & Elecs., Inc.,*
    No. CV 11-2768 PSG (SSx), 2015 WL 12765018 (C.D. Cal. Mar. 9, 2015) ....... 17

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.,*
    No. 3:08-MD-01198, 2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) ................... 28

*In re Elan Sec. Litig.,*
    385 F. Supp. 2d 363 (S.D.N.Y. 2005) ................................................................. 22

*In re Equifax Inc. Customer Data Sec. Breach Litig.*
    1:17-md-2800-TWT, 2020 WL 256132 (N.D. Ga. Jan. 13, 2020) ................. *passim*

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) .................................................................................. 24

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.,*
    293 F.R.D. 21 (D. Me. 2013) .............................................................................. 16

*In re Hyundai & Kia Fuel Econ. Litig.,*
    926 F.3d 539 (9th Cir. 2019) .............................................................................. 27

*In re Immune Response Sec. Litig.,*
    497 F. Supp. 2d 1166 (S.D. Cal. 2007) ............................................................... 15

*In re Linkedin User Privacy Litig.,*
    309 F.R.D. 573 (N.D. Cal. 2015) ....................................................................... 28

*In re NVIDIA Corp. Derivative Litig.,*
    No. C-06-06110-SBA (JCS), 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ....... 13

*In re Premera Blue Cross Customer Data Sec. Breach Litig.,*
    No. 3:15-md-2633-SI, 2019 WL 3410382 (D. Or. July 29, 2019) ................. 19, 20

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
    163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................ 24

iv

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008)...................................................................... 13

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    892 F.3d 968 (8th Cir. 2018)........................................................................ 20

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
    No. 1:14-md-02583-TWT, 2016 WL 6902351
    (N.D. Ga. Aug. 23, 2016)............................................... 19, 25, 26, 27, 28

*In re TJX Cos. Retail Sec. Breach Litig.*,
    246 F.R.D. 389 (D. Mass. 2007) ................................................................ 16

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
    720 F. Supp. 1379 (D. Ariz. 1989) ............................................................. 23

*Johansson-Dohrmann v. Cbr Sys., Inc.*,
    No. 12-cv-1115-MMA (BGS), 2013 WL 3864341 (S.D. Cal. July 24, 2013) ...... 18

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017)............................................................. 26, 27

*Kumar v. Salov N. Am. Corp.*,
    No. 14-CV-2411-YGR, 2017 WL 2902898 (N.D. Cal. July 7, 2017) .................. 17

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012)...................................................................... 13

*Linney v. Cellular Alaska P'ship*,
    Nos. C-96-3008 DLJ, et al., 1997 WL 450064 (N.D. Cal. July 18, 1997) .......... 15

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998)................................................................. 15, 16

*McBean v. City of New York*,
    233 F.R.D. 377 (S.D.N.Y. 2006).................................................................. 22

*Milberg LLP v. Laber*,
    137 S. Ct. 2262 (2017) ............................................................................... 27

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ................................................................ 14

*Nobles v. MBNA Corp.*,

No. C 06-3723 CRB, 2009 WL 1854965 (N.D. Cal. June 29, 2009) .................. 14

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982)......................................................... 14, 18

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ........................................................................ 28

*Satchell v. Fed. Express Corp.*,
    Nos. C 03–2659 SI, C 03-2878 SI,
    2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ...................................... 22

*Silber v. Mabon*,
    18 F.3d 1449 (9th Cir. 1994)............................................................. 13

*Smith v. Triad of Alabama, LLC*,
    No. 1:14-CV-324-WKW, 2017 WL 1044692 (M.D. Ala. Mar. 17, 2017)........... 16

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003)......................................................... 14, 26

*True v. Am. Honda Motor Co.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010)............................................... 23

*United States v. Armour & Co.*,
    402 U.S. 673 (1971) ........................................................................ 18

*United States v. McInnes*,
    556 F.2d 436 (9th Cir. 1977)............................................................. 15

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976)............................................................. 15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................ 25

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010).......................................................... 28

**RULES**

Fed. R. Civ. P. 23(a) ........................................................................ 24

Fed. R. Civ. P. Rule 23(b)(3) ............................................................ 26

Fed. R. Civ. P. 23 (c)(1)(C) ............................................................... 18

Fed. R. Civ. P. 23(e) .......................................................................... 2

**OTHER AUTHORITIES**

4 Herbert B. Newberg & Alba Conte,
    *Newberg on Class Actions* § 11:41 (4th ed. 2002) ................................. 13

I.      INTRODUCTION

Plaintiffs and Class Representatives Howard Chen, Betty Clayton, Stacey Halpin, Kim Maryniak, Summer Sadira, and Stan Griep (collectively, "Plaintiffs") respectfully move the Court to enter an order finally approving the proposed class settlement (the "Settlement") resolving all claims alleged against Defendant Banner Health ("Banner"). The Settlement terms are memorialized in the Parties' "Stipulation and Settlement Agreement" filed on December 5, 2019 [Doc. 171-1, Ex. 1 ("Settlement Agreement")], which this Court preliminarily approved on December 11, 2019. [Doc. 175 ("Preliminary Approval Order").][1]

In the Preliminary Approval Order, the Court provisionally determined that the proposed Settlement was entered into at arm's-length by experienced counsel after extensive, informed, and non-collusive negotiations, and that its terms fall within the range of reasonableness.  The Court therefore  directed distribution of the approved form of Class Notice to the members of the Settlement Class. Final approval of the proposed Settlement will provide the Settlement Class with substantial immediate benefits, including among other things, (i) a free two-year subscription to a state-of-the-art credit-monitoring and identity-protection service and (ii) a simplified claim process, affording the opportunity for each Settlement Class member to obtain reimbursement of Ordinary Expenses of up to $500 and Extraordinary Expenses of up to $10,000 (subject to an overall cap on reimbursement claims of $6,000,000). In addition, the Settlement obligates Banner to implement or continue multiple, detailed commitments to improve its information security systems, including continuation of specified security auditing and testing protocols and a corresponding ███████ spending commitment to improve its information security systems.

---

[1] Capitalized terms in this memorandum have the same meaning as those terms are defined in the Settlement Agreement.

Class Counsel have concluded that the terms and conditions of the Settlement Agreement are fair, reasonable, adequate, and in the best interests of the members of the Settlement Class. [*See* Joint Final Approval and Fee Declaration of Class Counsel ("Jt. Final & Fee Decl."), ¶¶ 54 through 75, filed contemporaneously herewith; *see also* Declaration of Andrew S. Friedman, Doc. 171 ("Friedman Decl."), ¶¶ 11-13; 16-17.] Accordingly, Plaintiffs respectfully submit that  the Court should approve the proposed Settlement under Fed. R. Civ. P. 23(e).

## II.     BACKGROUND

### A.     Summary of the Allegations

Banner operates  one of the largest, nonprofit healthcare systems in the country, generating approximately $7 billion in annual revenue through health services and insurance plans in six states. As a matter of course, Banner collects and maintains: (a) millions of electronic patient health and insurance records and significant personal identifying information ("PII") (including Social Security numbers, names, addresses, birth dates, tax and financial information, and health insurance information); (b) other personal healthcare information ("PHI"); (c) personal and professional information about its over 50,000 healthcare providers and employees, including healthcare providers; and (d) credit card and debit card numbers (with expiration dates) ("PCI") from customers of its facilities' food and beverage outlets.

Plaintiffs allege that, in June 2016, financially motivated cyber-criminals penetrated Banner's computer network, rummaged through Banner's information systems, installed hacking software, and exfiltrated massive quantities of PII, PHI, and PCI belonging to approximately 2.9 million people (the "Security Incident"). The stolen information includes the names, addresses, Social Security numbers, birthdates, medical and pharmaceutical histories for patients, sensitive information about Banner's healthcare providers (including their provider numbers and DEA numbers), and credit-card and debit-card numbers for about 30,000 food and beverage outlet customers. The Security Incident

1   was the largest healthcare data breach occurring in 2016 and the ninth largest healthcare

2   data breach of all time.[2] The Security Incident exposed Banner patients, insureds,

3   providers, and payment-card users to the  significantly increased risk and expense of

4   devastating financial- and medical-identity theft.

5        Plaintiffs further allege that fraudulent use of the stolen information began shortly

6   after the Security Incident: Plaintiff Halpin had fraudulent bank accounts opened and tax

7   returns filed in her name, and criminals attempted to use Plaintiff Kim Maryniak's credit

8   accounts. Other incidents of identity theft impacting Settlement Class members allegedly

9   occurred as a result of the Security Incident. The establishment of fraudulent bank and

10  PayPal accounts were opened. Unauthorized applications for credit at various retailers were

11  submitted. Credit cards for which Settlement Class members did not apply were issued.

12  Real estate was purchased using a Settlement Class member's credit. And fraudulent tax

13  returns were filed. The risk of fraud, including financial fraud and medical-identity theft,

14  remains ongoing.

15  **B.**    **Procedural History**

16       Banner publicly announced the Security Incident on August 3, 2016.  Shortly

17  thereafter, multiple putative class-action lawsuits were filed against Banner.  In all,

18  eleven lawsuits were filed:

19  - *Clark v. Banner Health*, Case No. 2:16-cv-02696-SRB;

20  - *Clayton v. Banner Health, et al.*, Case No. 2:16-cv-02707-DJH;

21  - *Duhame v. Banner Health*, et al., Case No. 2:16-cv-02831-JAT;

22  - *Chen v. Banner Health*, Case No. 2:16-cv-02843-DKD;

23  - *Bell v. Banner Health, et al.*, Case No. 2:16-cv-02867-BSB;

24  - *Vollmer v. Banner Health, et al.*, Case No. 2:16-cv- 02869-SRB;

25  - *Sevilen v. Banner Health*, Case No. 2:16-cv-02972-JJT;

26

27  [2] *See* https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2016-8631/, last
28  visited Feb. 10, 2019.

3

1       • *Reader v. Banner Health*, Case No. 2:16-cv-02994-ROS;

2       • *Weedman v. Banner Health, et al.,* Case No 2:16- cv-03086-MHB;

3       • *Hassett v. Banner*, 2:16-cv-03252-JJT; and

4       • *Rogers-Wilkinson v. Banner Health*, Case No. 2:16-cv-03468-DGC.

5   [*See* Jt. Final & Fee Decl., ¶ 6.] The cases were consolidated before this Court in late 2016,

6   and recaptioned as *In re Banner Health Data Breach Litigation*. *Id.* The Court appointed

7   Interim Co-Lead Class Counsel and an Executive Committee to represent the putative

8   class. [*Id.*]

9           On April 6, 2017, six named plaintiffs filed a master consolidated amended class

10  action complaint ("FAC") in the consolidated proceeding, asserting seven causes of action

11  against Banner: (1) Negligence, (2) Negligence Per Se, (3) Breach of Contract, (4) Breach

12  of the Implied Covenant of Good Faith and Fair Dealing, (5) Breach of the Implied Duty

13  to Perform with Reasonable Care, (6) Unjust Enrichment, and (7) Violation of the Arizona

14  Consumer Fraud Act ("ACFA"). [*See* Jt. Final & Fee Decl., ¶ 7; *see also* Doc. 71.]

15          Banner moved to dismiss the FAC on April 14, 2017 [Doc. 76], which the Court

16  granted in part and denied in part. [Doc. 106.] The Court denied Banner's Motion to

17  Dismiss as to Plaintiffs' claims for Negligence, Negligence Per Se, Unjust Enrichment, and

18  violation of the ACFA, but granted it with respect to Plaintiffs' claims for Breach of

19  Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Breach of

20  the Implied Duty to Perform with Reasonable Care. [*Id.*; Jt. Final & Fee Decl., ¶ 8.]

21          Plaintiffs filed their Second Consolidated Amended Class Action Complaint

22  ("SAC") on January 16, 2018, asserting additional claims for Breach of Implied-in-Fact

23  Contractual Term and Promissory Estoppel on behalf of potentially affected patients,

24  insurance-plan, and employee plaintiffs. [Doc. 114; Jt. Final & Fee Decl., ¶ 9.]

25          Banner filed its second motion to dismiss on February 15, 2018, seeking dismissal

26  of the newly asserted claims. [Doc. 117.] The Court subsequently dismissed Plaintiffs'

27  promissory-estoppel claim as well as their implied-in-fact contract claims with respect to

28
                                            4

the patient and insurance-plan Plaintiffs, while sustaining  the implied contract claims of the employee Plaintiffs. [Doc. 133.] Banner answered the SAC on September 7, 2018, denying Plaintiffs' claims and asserting numerous affirmative defenses. [Doc. 143; Jt. Final & Fee Decl., ¶¶ 10, 11.]

Over the course of the litigation, the Parties conducted substantial discovery. Plaintiffs propounded extensive written discovery requests, including twenty-three (23) interrogatories and fifty-seven (57) requests for production of relevant documents. The Parties negotiated key search terms resulting in the production of more than 800,000 records identified through Technology Assisted Review ("TAR"); Banner also produced additional discrete records to augment the TAR review process. [Jt. Final & Fee Decl., ¶¶ 12 through 16; 20, 21.] And Plaintiffs served Banner's third-party security auditors and consultants (Verizon, Mandiant and Deloitte) with document subpoenas. [*Id.*, ¶¶ 17, 18.]

After obtaining responsive information, Plaintiffs conducted a Rule 30(b)(6) deposition of a Banner representative encompassing relevant subjects and scheduled the depositions of five additional Banner representatives. [Jt. Final & Fee Decl., ¶¶ 22 through 24.]

For its part, Banner served the named plaintiffs with document requests and interrogatories and deposed four of them. [Jt. Final & Fee Decl., ¶¶ 21, 25.]

The Parties also had agreed on a schedule for the depositions of five (5) additional Banner 30(b)(6) designees, which were scheduled to commence in November 2018 and conclude in January 2019; however, those depositions were subsequently postponed upon the filing of the Joint Motion to Stay Case and Amend Case Management Order No. 1 [Doc. 151], which the Court granted on January 24, 2019 in order to allow the Parties time to focus their efforts on settlement negotiations. [Doc. 152; Jt. Final & Fee Decl., ¶ 26.]

**C.    Settlement Negotiations**

The Settlement is the product of extensive arm's length negotiations between the Parties with the assistance of two experienced and highly regarded mediators. [Jt. Final &

Fee Decl., ¶ 32.] The initial mediation on December 11, 2018, before the Hon. Judge Jay C. Gandhi (Ret.) failed. [*Id.*, ¶ 33.] The Parties then attended two additional mediations before Craig Phillips, which resulted in a tentative class settlement when the second session concluded on August 7, 2019. [Friedman Decl., ¶¶ 9-10; Jt. Final & Fee Decl., ¶ 33.]

Before agreeing to settle the Consolidated Actions, Class Counsel conducted a thorough investigation and analysis of the claims, defenses, and underlying events that are the subject of the Consolidated Actions. Class Counsel's analysis was informed by their careful evaluation of the applicable law and the relevant evidence developed through their review of hundreds of thousands of documents and data produced by Banner and consultation with multiple qualified experts. [Friedman Decl., ¶ 7; Jt. Final & Fee Decl., ¶ 34.]

In addition to undertaking the foregoing discovery and investigation, the Parties engaged in extensive pre-mediation activities so that their settlement negotiations would proceed on a fully informed basis. [Friedman Decl., ¶ 8; Jt. Final & Fee Decl., ¶ 35.] In advance of the meditations, the Parties prepared and exchanged detailed mediation statements addressing liability, damages, and potential settlement structures. [*Id.*] As the mediations progressed, the Parties continued their ongoing settlement dialogue and exchanged additional information through telephone conferences and an in-person interview of Banner's Chief Information Security Officer ("CISO"). [Friedman Decl., ¶ 9; Jt. Final & Fee Decl., ¶ 35.]

The settlement negotiations—which were hard fought and at times contentious—were thus conducted in a non-collusive process and at arm's length by highly qualified and experienced counsel on both sides. [*See* Friedman Decl., ¶¶ 5-12; Jt. Final & Fee Decl., ¶ 36.] Class Counsel have concluded that the proposed Settlement Agreement is fair and reasonable and represents a highly successful result for members of the proposed Settlement Class. [Friedman Decl., ¶ 16; Jt. Final & Fee Decl., ¶¶ 54-75.]

The resulting Settlement readily satisfies the requirements of Fed. R. Civ. P. 23 and the prevailing Ninth Circuit authority and, as such, it warrants final approval by the Court.

## III.   THE SETTLEMENT

### A.   The Settlement Class

In the Preliminary Approval Order, the Court preliminarily certified the Settlement Class as:

> All persons who were notified by Banner that their personal information may have been compromised as a result of the Security Incident.

[Doc. 175 at ¶ 7.] Excluded from the Settlement Class are the officers and directors of Banner during the Class Period, the Judge presiding over this action and her Honor's courtroom staff, and those entities that timely and validly request exclusion from the Settlement Class. [*Id.*]

### B.   Description of the Settlement Benefits

Under the Settlement Agreement, Banner agrees to provide the following benefits to the Settlement Class members.

#### 1.   State-of-the-Art Credit and Identity Monitoring

Settlement Class members will automatically be entitled to receive two (2) additional years of credit monitoring and identity protection services provided by Identity Guard Total and powered by IBM Watson. [Doc. 171-1, Ex. 1 at ¶ 20.] The credit monitoring program includes the following services:

- Up to $1 Million Dollars reimbursement insurance from AIG covering losses due to identity theft and stolen funds;

- Three-bureau credit monitoring providing notice of certain changes to the enrolled Settlement Class member's credit profile, including two-credit bureau inquiry alerts in real-time;

- Real time authentication alerts in as little as three seconds when someone attempts to make a change to enrolled Settlement Class members' personal account information within Identity Guard's network;

- Alerts based on searches of payday-loan providers and court records as well as monitoring of the top ten largest U.S. financial institutions for attempted or actual fraudulent use of the enrolled Settlement Class members' information;

- Online income tax filing alerts provided by LexisNexis and Turbo Tax;

- Dark Web Monitoring that will provide notification if an enrolled Settlement Class member's information such as Social Security number, credit card numbers, financial account numbers, and health insurance numbers are found on the Dark Web;

- Threat Alerts powered by IBM "Watson" providing proactive alerts about potential threats relevant to the enrolled Settlement Class members found by IBM Watson's artificial intelligence, for instance: breaches, phishing scams, and malware vulnerabilities;

- Customer support and victim assistance provided by Identity Guard; and

- Safe browsing software to help protect the enrolled Settlement Class member's computer(s) against malicious content. [*Id.*]

The Settlement Agreement establishes a simplified procedure permitting Settlement Class members to enroll in the credit monitoring program for a period of 12 months after final approval of the Settlement. [Jt. Final & Fee Decl., ¶ 42.]

### 2. Monetary Reimbursement for Losses

The Settlement also establishes a simplified procedure for Settlement Class members to submit claims for specified monetary reimbursement of designated expenses incurred after the Security Incident. The Settlement Class members will have twelve (12) months to submit their claims to the Settlement Administrator. [Jt. Final & Fee Decl., ¶ 43.]

Banner will pay valid claims for Ordinary Expenses, including actual time lost and certain out-of-pocket expenses, incurred after June 17, 2016, as a result of the Security Incident up to a limit of $500 per class member. [Doc. 171-1, Ex. 1 at ¶ 21; Jt. Final & Fee Decl., ¶ 44.] Reimbursement for ordinary time lost is for up to three (3) hours of lost time compensated at $15.00 per hour upon attestation that time was spent as a result of the Security Incident. [*Id.*]

Banner will also pay claims for Extraordinary Costs, including certain extraordinary out-of-pocket expenses and extraordinary additional time lost responding to identity theft or fraud, up to a limit of $10,000 per class member. [Doc. 171-1, Ex. 1 at ¶ 22; Jt. Final & Fee Decl., ¶ 44.] Payment for extraordinary compensable additional lost time shall be at the rate of $15.00 per hour unless the Settlement Class member establishes through documented proof that he or she took unpaid time off work and the Settlement Class member's actual standard compensation rate exceeds $15.00 per hour, in which case payment shall be at the rate of actual compensation up to a maximum of $40.00 per hour.[3] [*Id.*]

### 3.    Injunctive Relief & Business Practice Commitments

In addition to the credit monitoring and claim processes, the Settlement Agreement provides several different forms of injunctive relief in the form of extensive improvements to Banner's information security as well as business practice changes, which include requirements that Banner continue to follow new information-security practices that Banner put in place after the Security Incident and during the course of the litigation, and that Banner implement additional practices that will be put in place and maintained in the future—all to address Banner's network security prior to the Breach. [*See generally*, Ex. C

---

[3] Total payments under the Settlement for Ordinary Expenses and Extraordinary Expenses shall not exceed $6,000,000 (the "Claims Made Settlement Cap"). If valid claims submitted for Ordinary Expenses and Extraordinary Expenses, on or before the Claims Deadline, exceed the Claims Made Settlement Cap, all such claims shall be reduced on a pro rata basis prior to payment. [Doc. 171-1, Ex. 1 at ¶ 24.]

9

to the Settlement Agreement, Doc. 174 (sealed) ("Exhibit C"); Jt. Final & Fee Decl., ¶¶ 45 through 47.] Further, Banner has agreed to spend ███████ in information security during ████████████████████████████████████████████████. [*Id.*; Jt. Final and Fee Decl., ¶¶ 48, 49.]

### a.   Information Security Practice Changes

Banner has agreed that it has and/or will implement several security improvements and business-practice changes following the Security Incident, and will continue certain of those practices for ███████████, including but not limited to: (i) the on-boarding of a CISO to lead information security program improvement efforts, and the addition of fifty-eight full-time employees to Banner's Information Security Department, including a 13-person leadership team and three full-time employees dedicated to information security audit and assessment support, (ii) engagement of a reputable professional services firm to objectively evaluate Banner's information-security program to determine the maturity of its security function capabilities and to recommend a three-year road map for significant investment and improvements, and (iii) implementation of enhanced information security processes, among multiple others. [*See generall*y, Exhibit C; Jt. Final & Fee Decl., ¶¶ 46, 47.]

### b.   Information Security Spend

The Settlement Agreement also requires Banner to continue implementation of an enhanced Information Security budget. Banner will   complete ██████████ project to improve its information security systems implemented in response to the Breach. [Exhibit C, ¶ I(A); Jt. Final & Fee Decl., ¶ 48.] Further, during the ██████████ after final approval of the Settlement Agreement Banner will spend ██████████ of its overall IT budget to invest in and maintain leading practice information security solutions. [*Id.* at ¶ IV(A)(3); Jt. Final & Fee Decl., ¶ 49.]

### 4. Additional Terms

In addition to the foregoing individual monetary relief, free credit-monitoring and identity-protection services, and prospective business-practice commitments, the Settlement Agreement requires Banner to pay separately for:

- Dissemination of the Class Notice and for Settlement Administration, including the cost of implementing and developing a notice plan and the costs for JND Legal Administration ("JND") to administer the Settlement and evaluate and pay clams. [Doc. 171-1, Ex. 1 at ¶ 43.]

- A Service Award of $5,000.00 to each of the Settlement Class Representatives, subject to Court approval, compensating them for the time and effort expended in searching for and producing documents, responding to written discovery, and sitting for depositions. [Doc. 171-1, Ex. 1 at ¶ 25.]

- An award of attorneys' fees and costs to Class Counsel in an amount approved by the Court, not to exceed $2,900,000.00. [Doc. 171-1, Ex. 1 at ¶ 44.] [Jt. Final & Fee Decl., ¶ 50.]

### C. The Class Notice, Opting Out, Claim Deadlines, and Release Provisions

As noted above, JND has been retained to implement the Class Notice Program ("Notice Program") as directed by the Court's Preliminary Approval Order. [Doc. 175 at ¶¶ 14-16; Declaration of Jennifer M. Keough Regarding Notice Administration ("JND Decl."), attached as **Exhibit A**, ¶ 2.] Specifically, on December 23, 2019, Banner provided JND an electronic file containing 2,875,197 records. [*Id.*, ¶ 4.] Those records contained the names and addresses of all individuals Banner identified as Class Members. [*Id.*] JND next updated the Class Member address information using data from the National Change of Address ("NCOA") database, then analyzed the data to identify duplicates. [*Id.*] After removal of duplicates, JND arrived at a final count of 2,816,351 unique Class Members. [*Id.*]

1    In accordance with the Settlement Agreement, JND will mail the Court-approved

2    Postcard Notice via first class U.S. mail to all Class Members on February 10, 2020. [JND

3    Decl., ¶ 7.] The Notice will be in the form of a double-sided postcard instructing Settlement

4    Class members how to enroll in the credit-monitoring program and submit claims for the

5    monetary Settlement Class benefits. [*Id.*] It will also include a toll-free telephone number

6    for information related to the Settlement. [*Id.*, ¶¶ 7, 10.]

7    JND will also launch a Settlement Website (www.bh-settlement.com) on February

8    10, 2020, which will allow Class Members to learn more about the Security Incident, the

9    Action, and the Settlement, including answers to frequently asked questions, key dates and

10   deadlines, and an online Claim Form that will allow Class Members to submit claims for

11   Settlement benefits. [*Id.*, ¶ 9.] The website will also include downloadable copies of

12   important case documents, including both the Long Form Notice and Summary Notice

13   translated into Spanish. [*Id.*]

14   JND will maintain the toll-free information line and the Settlement Website

15   throughout the administration process. [JND Decl., ¶¶ 9, 11.]

16   Potential Settlement Class Members have sixty (60) days, or until April 10, 2020,

17   to object to or opt out of the Settlement. [Doc. 171-1, Ex. A; Jt. Final & Fee Decl., ¶ 51.]

18   At the conclusion of objection and opt out deadline, JND will provide an updated

19   declaration prior to the Final Approval Hearing detailing the results of the notice campaign,

20   any opt-outs or objections that are received, and claims received to date, as well as

21   providing website and toll-free information line statistics.  [JND Decl., ¶ 12; Jt. Final &

22   Fee Decl., ¶ 51.]

23   At the conclusion of objection and opt out deadline, JND will provide an updated

24   declaration prior to the Final Approval Hearing detailing the results of the notice campaign,

25   any opt-outs or objections that are received, and claims received to date, as well as

26   providing website and toll-free information line statistics.  [JND Decl., ¶ 12; Jt. Final &

27   Fee Decl., ¶ 52.]

28

The Class Notice Program readily satisfies the due process requirement that notice to the class members be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

Once the Settlement becomes final, Plaintiffs and Settlement Class members will release and discharge Banner from any and all claims and causes of action arising from the Security Incident or that were alleged or could have been alleged in the Actions (other than claims to enforce the Settlement Agreement). [Doc. 171-1, Ex. 1 at ¶¶ 28-31; Jt. Final & Fee Decl., ¶ 53.]

## IV.   ARGUMENT

### A.   The Proposed Settlement Warrants the Court's Final Approval

While the approval of the proposed Settlement Agreement is committed to the sound discretion of the Court, settlements of complex class actions prior to trial are strongly favored. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). As a matter of judicial policy, federal courts favor and encourage settlements, particularly in class actions, where the costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *Id.* (noting the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned"); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (same); *see generally*, 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 11:41 (4th ed. 2002) (same, collecting cases). Settlements are particularly favored "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re NVIDIA Corp. Derivative Litig.*, No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008).

"Although Rule 23 imposes strict procedural requirements on the approval of a class settlement, a district court's only role in reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.*, 696 F.3d

811, 819 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1998)); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (a class action settlement should be reviewed under "the universally applied standard [of] whether the settlement is fundamentally fair, adequate and reasonable"). Additionally, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003).

When class counsel is experienced and supports the settlement, and the agreement was reached after arm's-length negotiations, courts give a presumption of fairness to the settlement. *See Nobles v. MBNA Corp.*, No. C 06-3723 CRB, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981). As additional factors for determining whether a settlement is fair, reasonable, and adequate, the Ninth Circuit has identified:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026. "The relative degree of importance to be attached to any particular factor will depend upon . . . the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625.

As shown below, each of the relevant factors identified by the Ninth Circuit supports final approval of the proposed Settlement.

### 1.     The Settlement is Presumptively Fair

Because the Settlement Agreement was reached through arms-length negotiation between experienced parties whose negotiations were overseen by two experienced mediators, it is entitled to a presumption of fairness. *Anderson v. Nextel Retail Stores, LLC*,

14

Nos. CV 07–4480–SVW (FFMx), et al., 2010 WL 8591002, at *15 (C.D. Cal. Apr. 12, 2010); *see also*, *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007) ("the fact that the settlement agreement was reached in arm's length negotiations after relevant discovery [has] taken place create[s] a presumption that the agreement is fair," quoting *Linney v. Cellular Alaska P'ship*, Nos. C-96-3008 DLJ, et al., 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997) *aff'd*, 151 F.3d 1234 (9th Cir. 1998) (alterations in original)); *Adams v. Inter-Con Sec. Sys., Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

### 2. The Relative Strengths of Plaintiffs' Claims

Settlements resolve the inherent uncertainty on the merits, and are therefore strongly favored by the courts, particularly in class actions. *See Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977). This action is not unique in this regard—the Parties disagree diametrically about the merits of Plaintiffs' claims, especially with respect to issues of causation and damages, and there is substantial uncertainty as to the ultimate outcome of this litigation. [Jt. Final & Fee Decl., ¶¶ 54 & 55.]

While Plaintiffs are convinced that their substantive claims are meritorious and supported by Banner's alleged failure to remedy auditor-identified deficiencies in its data security infrastructure, they are cognizant that success is never guaranteed. [Jt. Final & Fee Decl., ¶ 56.] Banner strenuously contested the merits of Plaintiffs' claims and successfully moved to dismiss several claims initially alleged by Plaintiffs. [*Id.*]

If the litigation were to proceed, Banner undoubtedly would seek summary judgment and contest class certification. [Jt. Final & Fee Decl., ¶ 57.] And Plaintiffs faced the ultimate risk that a jury might find against them on some or all of their claims or that Banner might prevail in the inevitable appeal following a jury verdict in favor of Plaintiffs. [*Id.*] Certainly, the litigation has proceeded to the point where "the parties have sufficient

1   information to make an informed decision about settlement," including an informed and

2   realistic assessment of the strengths and weakness of their respective cases. *See Linney v.*

3   *Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir. 1998).

**3.   The Risk, Expense, Complexity, and Further Litigation**

5   Although nearly all class actions involve a high level of risk, expense, and

6   complexity, *Linney*, 151 F.3d at 1242, data breach cases are especially risky and complex.

7   *See, e.g.*, *Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060(RMB)(RLE),

8   2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting cases).

9   The Courts have reached divergent decisions on plaintiffs' efforts to obtain class

10   certification in data-breach cases. *Compare In re Hannaford Bros. Co. Customer Data Sec.*

11   *Breach Litig.*, 293 F.R.D. 21, 35 (D. Me. 2013) (denying certification), and *In re TJX Cos.*

12   *Retail Sec. Breach Litig.*, 246 F.R.D. 389, 401 (D. Mass. 2007) (same), with *Smith v. Triad*

13   *of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, at *16 (M.D. Ala. Mar.

14   17, 2017) (granting certification); *see also In re Equifax Inc. Customer Data Sec. Breach*

15   *Litig. ("Equifax"),* 1:17-md-2800-TWT, 2020 WL 256132, at *7 (N.D. Ga. Jan. 13, 2020)

16   (granting final approval) ("Class certification outside of the settlement context also poses

17   a significant challenge.") (citing *Adkins v. Facebook, Inc*., No. C 18-05982-WHA, 2019

18   WL 7212315, at *9 (N.D. Cal. Nov. 26, 2019) (denying motion to certify data breach

19   damages class)).[4] Compounding these risks is the reality of the non-static data-breach-

20   specific case law that is currently evolving with differing results; there is no guarantee for

21   either side of the ultimate result. *See In re Anthem, Inc. Data Breach Litig*., No. 15-MD-

22   02617-LHK, 2018 WL 3960068, at *11 (N.D. Cal. Aug. 17, 2018) ("To begin, data-breach

23   litigation is an actively developing field of the law where much of the legal landscape is

24

25

---

26   [4] Plaintiffs note that most data-breach actions have resolved prior to contested certification
proceedings. While Plaintiffs strongly believe that certification would be appropriate in
27   this case, they are cognizant that the issue remains less than certain and presents them an
essentially case-ending risk if they were to proceed and fail to certify a class.

28

still shifting and unsettled."). Thus, there is a not insignificant risk that Banner would successfully oppose class certification. [Jt. Final & Fee Decl., ¶ 58, 59.]

In addition, Banner indicated that it was poised to file motions for summary judgment asserting defenses based on the alleged lack of causation, damages, and standing. [Jt. Final & Fee Decl., ¶ 60.] While Plaintiffs believe that Banner's bid for summary judgment would fail, they are not blind to the prospect that in the absence of settlement some or all of their remaining claims might be vulnerable to summary disposition. [*Id.*]

And, of course, to prevail in this case Plaintiffs would need overcome Banner's inevitable *Daubert* challenges to expert testimony and convince a jury to render a verdict in their favor. [Jt. Final & Fee Decl., ¶ 61.] If this case were to proceed to trial, it would undoubtedly have involved a proverbial "battle of the experts," with the Parties advancing competing and hotly contested expert testimony. *See, e.g.*, *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2017 WL 2902898, at *7 (N.D. Cal. July 7, 2017), *appeal dismissed*, No. 17-16621, 2017 WL 5502713 (9th Cir. Sept. 21, 2017), and *aff'd* 737 F. App'x 341 (9th Cir. 2018) (granting final approval in settlement of claims implicating a "battle of the experts"); *In re Celera Corp. Sec. Litig.*, No. 5:10-cv-02604-EJD, 2015 WL 7351449, at *6 (N.D. Cal. Nov. 20, 2015) (same); *In re China Intelligent Lighting & Elecs., Inc.*, No. CV 11-2768 PSG (SSx), 2015 WL 12765018, at *4 (C.D. Cal. Mar. 9, 2015) (same). At the end of the expert battles, it is possible the jury would be unable to resolve the highly complex technical and damage issues underlying Plaintiffs' theories of the case.

Proceeding to trial in this action would have been costly for both Plaintiffs and Banner; recovery was not guaranteed; and there was the certainty of protracted appeals no matter which side prevailed in the trial court. [Jt. Final & Fee Decl., ¶ 62.] *See, e.g., Kumar,* 2017 WL 2902898, at *7; *Equifax*, 2020 WL 256132, at *10.

In the final analysis, Plaintiffs would need to run this procedural, legal, and evidentiary gauntlet, and prevail at every stage to obtain a recovery for the class members. And had Plaintiffs prevailed at trial, any recovery for the class would be delayed for years

by the protracted pretrial motion process, lengthy jury trial, post-trial motions and appeals. [Jt. Final & Fee Decl., ¶ 63.] The proposed Settlement therefore achieves a far more certain and preferable result for the Settlement Class members than continued litigation, as it strikes an appropriate balance between the potential benefits, on the one hand, and the risks and costs associated with continued litigation, on the other. [*Id.*] *Officers for Justice*, 688 F.2d at 624; *United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).

**4.    Risk of Maintaining Class Action Status throughout Trial**

Plaintiffs' claims have yet to be certified. [Jt. Final & Fee Decl., ¶ 64.] If the Court granted Plaintiffs' forthcoming motion for class certification, Plaintiffs still faced the continuing risk that the class would be ultimately decertified under Fed. R. Civ. P. 23 (c)(1)(C).   [*Id.*] As stated in the *Anthem* court's final approval order: "While there is no obvious reason to treat certification in a data-breach case differently than certification in other types of cases, the dearth of precedent makes continued litigation more risky…. Due to the unsettled nature of the legal questions, Plaintiffs would likely have to contend with changing interpretations of procedural and substantive provisions throughout the course of the case." *In re Anthem, Inc. Data Breach Litig. ("Anthem")*, 327 F.R.D. 299, 318 (N.D. Cal. 2018).

**5.    The Benefits Offered under the Settlement Agreement**

The Settlement benefits described in Section III(B), above, represent an exceptional result for the Settlement Class members given the risks, costs, and delays associated with continued litigation. [Jt. Final & Fee Decl., ¶ 65.]

The Credit Monitoring and Identity Protection Services automatically available to every Settlement Class member have a retail value to each member of $499.92 ($20.83 per month for 24 months).[5] *See* https://www.identityguard.com/plans, last visited February 10,

---

[5] The retail value of these services (rather than the discounted bulk cost) is the proper gauge to apply here, given that this represents the value of the benefit Settlement Class members will actually receive. *See, e.g., Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115-MMA (BGS), 2013 WL 3864341, at *9 (S.D. Cal. July 24, 2013); *Equifax*, 2020 WL

2020. Given the class size of approximately 2.9 million members, the Credit Monitoring and Identity Protection Services alone constitute an enormous benefit, providing tens of millions of dollars in credit monitoring, identity protection and insurance services valued on a retail basis. Thus, for every one percent (1%) of the Settlement Class members who receive these services, the value to the Settlement Class is approximately $14,497,680. [Jt. Final & Fee Decl., ¶ 66.]

The quality and duration of the credit monitoring and identity protection services are directly on par with, and in many instances superior than, those products offered in similar data breach settlements. [Jt. Final & Fee Decl., ¶ 67.] *See e.g. In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-md-2633-SI, 2019 WL 3410382, at *23 (D. Or. July 29, 2019) (granting preliminary approval of settlement, noting the credit monitoring and identity protection services offered by Identity Guard added "significant value to the Settlement Class"); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig. ("Home Depot")*, No. 1:14-md-02583-TWT, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (granting final approval and noting "18 months identity monitoring services [from Identity Guard] also confers a substantial benefit to the Settlement Class"); *Anthem*, 327 F.R.D. at 319 (discussing benefits to class of two-year credit monitoring subscription); *Equifax*, 2020 WL 256132, at *17 ("This Court has repeatedly lauded high-quality credit monitoring services as providing valuable class-member relief that would likely not otherwise be recoverable at trial, as have other courts in connection with other data breach settlements.").

In addition to the Credit Monitoring and Identity Protection Services, Settlement Class members are entitled to reimbursement of up to $500 each for Ordinary Expenses and up to $10,000 each for Extraordinary Expenses incurred as a result of the Security

---

256132, at *38 ("[C]ourts have often recognized the benefit of credit monitoring, use its retail cost as evidence of value, and consider that value in awarding fees.") (collecting cases).

Incident, subject to a $6,000,000 cap on payment of claims. [Doc. 171-1, Ex. 1 at ¶¶ 21, 22 & 24; Jt. Final & Fee Decl., ¶ 68.] *Compare Anthem*, 327 F.R.D. at 310 (granting final approval) (noting class members may submit claims up to $10,000 for reimbursement of out-of-pocket costs).

Once again, the monetary-reimbursement benefits made available by the Settlement are more favorable than similar benefits approved by the Courts in many other data breach class settlements. [Jnt. Final & Fee Decl., ¶ 69.] Under the Settlement Agreement, Settlement Class members can submit claims for lost time of up to eighteen (18) hours: three (3) hours of lost time reimbursable at $15 an hour; and, if documented and supported, fifteen (15) hours of additional lost time reimbursable at an hourly rate as high as $40. [Doc. 171-1, Ex. 1 at ¶¶ 21 & 22; Jnt. Final & Fee Decl., ¶ 69.] *Cf. In re The Home Depot, Inc., Customer Data Sec. Breach Litig*., 1:14-md-02583-TWT (N.D. Ga. Mar. 7, 2016), Dkt. 181-2 at ECR 9 (allowing maximum of seven (7) hours of reimbursable time at $15 per hour and providing for $10,000 maximum recovery for out-of-pocket losses per class member); *In re Premera Blue Cross Customer Data Sec. Breach Litig.,* 2019 WL 3410382, at *22 (allowing maximum twenty (20) hours of reimbursable time at $20 per hour, subject to $10,000 maximum per class member).[6]

Finally, Banner's IT-security business practice enhancements provide significant value to all Settlement Class members. [Jt. Final & Fee Decl., ¶ 70.] As part of the Settlement Agreement, Banner has agreed to implement and maintain several, detailed Information Security Practice Changes [Doc. 171-1, Exhibit C], fortifying the security of the PII, PHI, and PCI in Banner's possession through upgraded industry-leading systems and protocols. These prospective business-practice improvements benefit all Settlement Class members because Banner continues to maintain protected information even for those patients and insureds who no longer receive medical treatment at Banner's facilities. *See In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974 n.6 (8th Cir. 2018)

---

[6] Copies of unreported decisions are appended to the Friedman Decl., Doc. 171-6.

("[T]he injunctive relief [implementation of data security measures] … has value to all class members"); *Anthem*, 327 F.R.D. at 319 ("For example, Anthem must change its data retention policies, follow specific remediation schedules, and do annual IT security risk assessments and settlement compliance review. This nonmonetary relief benefits millions of Settlement Class Members, including those who did not submit a claim form. The Court finds that this nonmonetary relief further weighs in favor of final approval."); *Equifax*, 2020 WL 256132, at *3 ("Equifax's binding financial commitment to spend $1 billion on data security and related technology substantially benefits the class because it ensures adequate funding for securing plaintiffs' information long after the case is resolved.").

Following the Security Incident and filing of the consolidated lawsuits, Banner spent ████████ on improved data security and has committed to spending an additional ████████ in such security improvements, protocols and procedures ████████ following the breach. [Doc. 171-1, Exhibit C at ¶ I(A); Jt. Final & Fee Decl., ¶ 71.] Banner has further committed to implement specific future improvements and practices to protect the Settlement Class's PII, PHI, and PCI and to spend an appropriate percentage of its annual IT budget on information security. [Doc. 171-1, Exhibit C at ¶ IV(A)(3).]

## 6. Extent of Discovery & Stage of the Proceedings

This was no quick settlement. [Jt. Final & Fee Decl., ¶ 72.] The Court is familiar with the facts and lengthy procedural history of this case. Through extensive discovery, both formal and informal, each side amassed substantial factual and documentary evidence and expert analysis in support of their respective positions, and the Court has already addressed many key issues in its rulings granting in part and denying in part Banner's two motions to dismiss. [Docs. 106 & 133.]

The pertinent question is whether class counsel have sufficient information to ensure "effective representation." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 966 (N.D. Ill. 2011). Courts have repeatedly explained that it does not matter whether the discovery is labelled "formal" or "informal;" instead "the pertinent

inquiry is what facts and information have been provided." *Id.* at 967; *see also McBean v. City of New York*, 233 F.R.D. 377, 384-85 (S.D.N.Y. 2006); *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 370 (S.D.N.Y. 2005).

With the benefit of tens of thousands of pages of documents, written and deposition discovery, liability and damages expert analysis, and an in-depth interview of Banner's then-acting CISO, Co-Lead Counsel were well positioned to pursue fully informed settlement negotiations during multiple mediation sessions overseen by two highly qualified and respected mediators. [Jt. Final & Fee Decl., ¶¶ 73, 74.] *Cf. Equifax*, 2020 WL 256132, at *10 ("In particular, class counsel conducted a thorough factual and legal investigation in order to prepare their comprehensive consolidated amended complaint; exhaustively researched and analyzed the applicable law; reviewed more than 500,000 pages of documents and voluminous electronic spreadsheets from Equifax []; consulted with various experts; had the benefit of substantial informal discovery, including meetings with Equifax and its senior employees responsible for data security []; and engaged in confirmatory discovery after the term sheet was finalized."); *see also Satchell v. Fed. Express Corp.*, Nos. C 03–2659 SI, C 03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *see, e.g., Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (citing *Satchell* and other authority). Co-Lead Counsel were thus well-informed of the important facts and relevant legal issues when negotiating the Settlement Agreement. *Anthem*, 327 F.R.D. at 320 ("This exchange of information and progress in the litigation confirm that the parties have a good sense of the strength and weaknesses of their respective cases in order to "make an informed decision about settlement.") (quotation omitted).

### 7.   The Experience and Views of Counsel

Courts recognize that the opinions of experienced counsel supporting a settlement after vigorous arm's-length negotiations are entitled to considerable weight in the final approval analysis. As one court put it:

> Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. This is because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation. Thus, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.

*In re Apollo Grp. Inc. Sec. Litig.,* Nos. CV 04–2147, CV 04–2204, and CV 04–2334–PHX–JAT, 2012 WL 1378677, at *2 (D. Ariz. Apr. 20, 2012) (internal quotations and citation omitted); *accord In re Washington Pub. Power Supply Sys. Sec. Litig.,* 720 F. Supp. 1379, 1392 (D. Ariz. 1989) (noting that "[c]ounsels' opinions warrant great weight both because of their considerable familiarity with this litigation and because of their extensive experience in similar actions"); *see also True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1078-79 (C.D. Cal. 2010) (holding that class counsel's views that settlement was reasonable weighed in favor of settlement).

Co-Lead Counsel were appointed three years ago based on their substantial experience litigating complex class action cases. [Jt. Final & Fee Decl., ¶ 75.] Having worked on behalf of the putative class since the Security Incident was first announced and having dedicated thousands of hours to the case, it is the informed opinion of Co-Lead Counsel and the Class Executive Committee that, given the uncertainty and expense of pursuing this case through trial, the Settlement Agreement is fair, reasonable, and adequate and in the best interests of the Settlement Class. [Friedman Decl., ¶¶ 13 & 16; Jt. Final & Fee Decl. ¶ 75.] In light of the foregoing and their collective experience, Co-Lead Counsel unequivocally endorse the proposed Settlement Agreement. [Jt. Final & Fee Decl. ¶ 75.]

1

**8.**     **The Presence of a Governmental Participant**

2       This is not a case in which Plaintiffs piggy-backed claims initiated by or prosecuted

3   by a government agency. At the same time, it is worthy to note that, despite receipt of the

4   CAFA notice, Plaintiffs have thus far received no indication of disapproval from any

5   government agency. [Jt. Final & Fee Decl., ¶ 76; JND Decl., ¶¶ 5, 6.]

6

**9.**     **The Reaction of the Class Members to the Proposed Settlement**

7       The deadline for objections to the Settlement Agreement has not, as of the date of

8   this filing, expired. Co-Lead Counsel will respond to all objections through a reply

9   memorandum or separate responsive brief. [Jt. Final & Fee Decl., ¶ 77.]

10

**B.**     **The Court Should Finally Certify the Settlement Class.**

11       Courts favor the use of settlement classes "to foster negotiated solutions to [class]

12   actions." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d

13   768, 784 (3d Cir. 1995). A settlement class in complex litigation "actually enhances absent

14   class members' opt out rights because the right to exclusion is provided simultaneously

15   with the opportunity to accept or reject the terms of a proposed settlement." *In re Prudential*

16   *Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995).

17       In its Preliminary Approval Order, the Court provisionally certified the Settlement

18   Class pursuant to Federal Rule of Civil Procedure 23. [Doc. 175.] Nothing with respect to

19   class certification has materially changed since preliminary certification, and the reasons

20   for that preliminary certification support final certification of the Settlement Class.

21

**1.**     **The Settlement Class Satisfies Rule 23(a)**

22       The prerequisites for class certification under Rule 23(a)—numerosity,

23   commonality, typicality, and adequacy—are each satisfied.

24       The proposed settlement class includes approximately 2.9 million individuals, and

25   thus readily satisfies the numerosity requirement. [7] *See* Fed. R. Civ. P. 23(a)(1).

26

27   ---
[7] Plaintiffs in their SAC pled the Security Incident affected approximately 3.7 million persons. *See e.g.* SAC, ¶ 241. Banner's 30(b)(6) representative testified, however, that after duplicate records were removed, the total number affected was approximately 2.9 million.

28

24

The proposed class also amply satisfies the commonality requirement, which requires that class members' claims "depend upon a common contention," of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The primary issue driving this litigation is whether Banner failed to adequately and reasonably secure the PII, PHI, and PCI entrusted to it by the Plaintiffs and the Settlement Class members. The answer to that question depends on common evidence that does not vary among the Settlement Class members, and so can fairly be resolved—whether through litigation or settlement—for all class members at once. *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Indeed, all members of the Settlement Class were impacted in a common way by the same event—the Security Incident—which exposed their PII, PHI, and/or their PCI to cyber-thieves. All members of each putative classes alleged in the SAC assert the same legal claims. Common questions of law and fact abound. *See, e.g.*, *Home Depot*, 2016 WL 6902351, at *2 ("Here, the Settlement Class Members are joined by the common questions of law and fact that arise from the same event—the data breach."); *Anthem*, 327 F.R.D. at 308 ("The extensiveness and adequacy of Anthem's security measures lie at the heart of every claim. Moreover, the answer to those questions does not vary from Settlement Class Member to Settlement Class Member because, as noted, Anthem stored all of the Settlement Class Members' personal information in one data warehouse."); *Equifax*, 2020 WL 256132, at *11 ("All members of the class suffered the same alleged injury, exposure of their data in the Equifax data breach, stemming from the same conduct and the same event.").

Third, Rule 23's typicality requirement is readily satisfied here. The Settlement Class Representative's claims are typical of those held by other Settlement Class members because they arise from the same data breach Security Incident and involve the same legal theories. *See, e.g.*, *id.* at 309 ("The parties have established typicality…. The class representatives, like the class as a whole, each had different types of personal information

stored on Anthem's system that was exfiltrated during the breach of that system."); *Home Depot*, 2016 WL 6902351, at *2 ("The Consumer Plaintiffs' claims arise from the same data breach and Home Depot's conduct in connection with the data breach. They are also based on the same legal theory that Home Depot failed to protect their personal and financial information. The typicality requirement has been met."); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) (typicality satisfied "if the plaintiff endured a course of conduct directed against the class"); *Equifax*, 2020 WL 256132, at *12 ("Plaintiffs' claims here arise from the same data breach and Equifax's conduct in connection with the data breach. The claims are also based on the same overarching legal theory that Equifax failed in its common-law duty to protect their personal information. The typicality requirement has been met.").

Finally, class representation is adequate because (i) Co-Lead Counsel and the Class Executive Committee members are highly qualified and competent to vigorously prosecute the action, (ii) the interests of the Settlement Class Representatives are not antagonistic to the interests of the Settlement Class, and (iii) the Settlement Class Representatives have and will fairly and adequately protect the interests of the Settlement Class. [Doc. 175 at ¶ 8.] *Accord*, *Staton*, 327 F.3d at 957.

**2.**     **The Settlement Class Satisfies Rule 23(b)(3)**

In addition to meeting the conditions imposed under Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. Rule 23(b)(1), (2), or (3).

Here, the proposed class is maintainable under Rule 23(b)(3), as "questions of law or fact common to class members predominate over any questions affecting only individual members," and class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy."[8]

---

[8] The manageability inquiry under the superiority analysis is irrelevant for purposes of certifying a settlement class. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).

1    As in other data breach cases, a common nucleus of operative facts and shared legal

2    claims dominate the litigation as all claims arise out of a common course of conduct by

3    Banner and the events leading up to and giving rise to the Security Incident. *See, e.g.*, *Home*

4    *Depot,* 2016 WL 6902351, at *2 (order granting final approval) ("The many common

5    questions of fact and law that arise from Home Depot's conduct predominate over any

6    individualized issues. These common questions include whether Home Depot failed to

7    reasonably protect Class Members' personal and financial information, whether it had a

8    legal duty to do so, and whether Home Depot failed to timely notify Settlement Class

9    Members of the data breach. This requirement has been met."); *Anthem*, 327 F.R.D. at 314-

10   15 (granting final approval) (noting the "adequacy of Anthem's security measures …

11   permeates Plaintiffs' negligence claims," and concluding that "[a] common nucleus of facts

12   and potential legal remedies dominates this litigation") (citing *Hanlon*, 150 F. 3d at 1022);

13   *Equifax*, 2020 WL 256132, at *13 ("[C]ommon questions predominate because all claims

14   arise out of a common course of conduct by Equifax. The focus on a defendant's security

15   measures in a data breach class action 'is the precise type of predominant question that

16   makes class-wide adjudication worthwhile.'") (citing *Anthem*, 327 F.R.D. at 312).[9]

17   A class-wide resolution of Plaintiffs' claims here is furthermore superior to "other

18   available methods for the fair and efficient adjudication of the controversy." *Hanlon*, 150

19   F.3d at 1023. As in *Hanlon*, it is neither economically feasible nor judicially efficient for

20   approximately 2.9 million individuals to litigate their own individual claims: the amount

21   at stake for individual class members is too small, the technical issues involved are too

22   complex, and the required expert testimony and document review too costly. *See Just Film*,

---

23   [9] Further, the fact that multiple state laws are implicated in this case does not defeat

24   predominance: "[T]he idiosyncratic differences between state consumer protection laws
     are not sufficiently substantive to predominate over the shared claims" for purposes of Rule

25   23(b)(3). *Anthem*, 327 F.R.D. at 315 (distinguishing *Hyundai*, *infra*) (citation omitted).
     Here too, "Plaintiffs' theories across these consumer-protection statutes are essentially the

26   same." *Id.*; *see also Bobbit v. Milberg LLP*, 801 F.3d 1066 (9th Cir. 2015), *cert. granted,*

27   *judgment vacated sub nom. Milberg LLP v. Laber*, 137 S. Ct. 2262 (2017); *In re Hyundai*

28   *& Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) (en banc).

847 F.3d 1108 at 1123-24; *Wolin v. Jaguar Land Rover N. Am., LLC,* 617 F.3d 1168, 1175 (9th Cir. 2010) (class certification proper where "recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis"). A class action remains the superior method of adjudicating the instant claims arising from this data breach. *See, e.g., In re Linkedin User Privacy Litig.,* 309 F.R.D. 573, 585 (N.D. Cal. 2015); *Home Depot,* 2016 WL 6902351, at \*3*; In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.,* No. 3:08-MD-01198, 2009 WL 5184352, at \*6-7 (W.D. Ky. Dec. 22, 2009); *Equifax,* 2020 WL 256132, at \*14.

## V.   THE NOTICE PLAN COMPLIES WITH DUE PROCESS

The Court previously approved the notice plan proposed in this case and found it satisfied all requirements of due process and Rule 23. [Doc. 175 at ¶ 14.] The notice plan is now in the process of being implemented by JND. [JND Decl. at ¶¶ 4 through 11.] The Court should thus find that the Class received the best notice practicable under the circumstances in compliance with Rule 23 and the Due Process Clause. *See, e.g.*, *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985); *Home Depot,* 2016 WL 6902351, at \*3.

## VI.   CONCLUSION

Plaintiffs respectfully request an Order: (1) finally certifying the Settlement Class; and (2) granting final approval of the Settlement Agreement.

DATED this 10th day of February, 2020.

**BONNETT, FAIRBOURN, FRIEDMAN**
**& BALINT, P.C.**

By:   *s/ Andrew S. Friedman*
    Andrew S. Friedman
    William F. King
    2325 E. Camelback Road, Suite 1100
    Phoenix, Arizona 85016

Paul L. Stoller
**DALIMONTE RUEB STOLLER, LLP**
2425 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
*Co-Lead Counsel*

Eric H. Gibbs (pro hac vice)
David Stein (pro hac vice)
Amanda M. Karl (pro hac vice)
**GIRARD GIBBS LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
ehg@classlawgroup.com
ds@classlawgroup.com
amk@classlawgroup.com

Robert B. Carey (011186)
Leonard W. Aragon (020977)
Michella A. Kras (022324)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
rob@hbsslaw.com
leonard@hbsslaw.com
michellak@hbsslaw.com

*Class Executive Committee*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document filed through the ECF system on February 10, 2020 will be electronically sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

Dated February 10, 2020.

*s/Karen Vanderbilt*

29